# EXHIBIT "1"

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3

4   SCOT DAVIS; BRIAN FORD; JEREMY          )
    HARRIS,                                 )
                                            )
5                   PLAINTIFFS,             )
                                            )  CASE NO.
6             VS.                           )  CV 12-4990 ABC  (SHx)
    CITY OF BEAUMONT, A MUNICIPAL           )
7   CORPORATION; FRANK COE,                 )
    INDIVIDUALLY AND AS CHIEF OF            )
8   POLICE OF THE BEAUMONT POLICE           )
    DEPARTMENT; AND DOES 1 THROUGH          )
9   10 INCLUSIVE,                           )
                    DEFENDANTS.             )
10  _____   )

11

12
                DEPOSITION OF SCOT L. DAVIS
13
                   FRIDAY, MAY 24, 2013
14

15

16

17

18

19

20  FILE NO. 20204-A

21  REPORTED BY:  DIANE CARVER MANN, CLR, CSR NO. 6008

22

23

24

25

1    Q    And when did you graduate from San Bernardino

2  Sheriff's Academy?

3    A    In June of '97.

4    Q    And so you had been with San Bernardino for

5  about ten years at the point in time that you were hired

6  by Beaumont?

7    A    Correct.

8    Q    And did you work in the jail before you went

9  into patrol in San Bernardino?

10    A    Yes.

11    Q    What was your rank when you left

12  San Bernardino?

13    A    Deputy sheriff.

14    Q    When you became a member of the Beaumont Police

15  Department, did you also become a member of the Beaumont

16  Police Officers Association?

17    A    Yes.

18    Q    Is it your understanding that all of the sworn

19  officers other than management are members of the POA?

20    A    Yes.

21    Q    Have you ever been an officer; in other words,

22  held some elected position in the POA?

23    A    Yes.

24    Q    And what positions have you held?

25    A    I currently hold the position of president of

1     And at that point in time do you recall who the
2  officers were of the POA?

3     MS. HARPER: Objection. Vague.
4  BY MR. CUNNINGHAM:

5     Q   Who were the elected -- the president, if there
6  was a vice-president, what other elective offices in the
7  POA, who held those offices at that time?

8     A   At the time Christopher Ramos was the POA
9  president.

10    Q   Is there a vice-president, or was there a
11 vice-president at the time?

12    A   I believe Clark and Corporal Ortiz was on the
13 board at the time. I don't recall what position he was
14 holding, either secretary or treasurer.

15    Q   Okay. At the time of that meeting in April of
16 2011 you did not -- the term "officer" causes some
17 confusion because obviously everyone in the Peace
18 Officers Association is a peace officer, but you did not
19 hold an elected --

20    MS. HARPER: We usually use "board member."
21 BY MR. CUNNINGHAM:

22    Q   Okay. Board member. Does that term work for
23 you, sir?

24    A   Yes, sir.

25    Q   At the time this meeting occurred in April of

3

```
 1    2011, you were not one of the board members; is that
 2    correct?
 3         A    Correct.
 4         Q    And were either Corporal Harris or Officer Ford
 5    board members at that time?
 6         A    No, they were not.
 7         Q    If you recall, during that meeting was there
 8    any discussion by anyone of holding the no-confidence
 9    vote as to the chief?
10         A    I don't understand the question.
11         Q    Well, did you hear the term "a vote of no
12    confidence" discussed during that meeting?
13         A    Yes.
14         Q    Okay.  And do you recall who raised the issue?
15         A    Yes.
16         Q    Who was it?
17         A    I did.
18         Q    Okay.  And was a vote taken on a vote of no
19    confidence at the meeting?
20         A    Yes.
21         Q    Okay.  And do you recall the outcome of the
22    vote?
23         A    Yeah.  It was decided to not go that route.
24         Q    Do you recall who the highest-ranking member of
25    the department was who was present at that meeting?
```

4

```
1          A     My evaluation was part of the process, yes.

2          Q     And did you prepare that in writing so that it

3     could be incorporated into the letter?

4          A     Yes.

5          Q     As opposed to saying it to someone who might

6     type it up.

7          A     I prepared it myself.

8          Q     In the First Amended Complaint there are some

9     citations to portions of the letter.  It refers to an

10    Officer No. 3 and an Officer No. 7.  This is at Pages 5

11    through 9 of the First Amended Complaint.  And if I can

12    show this to you.  I have only brought one copy, but I

13    think everyone has seen it.

14               In the Complaint it alleges that Officer No. 3

15    was yourself, and as you read through the portions of

16    the letter that are attributed to Officer No. 3, are

17    those things that you wrote?

18         A     Yes.

19         Q     Thank you.  Before you prepared your written

20    portion of the evaluation, did you compare notes or

21    discuss what you were going to include in your

22    evaluation with any other members of the POA?

23         A     No.

24         Q     Did someone come up with a questionnaire or

25    subject matters that the evaluations would cover?
```

1    college-offered courses?

2       A    I don't recall.

3       Q    Now, how long after the April, 2011 meeting was

4    it that this letter or evaluation was sent to someone at

5    the City?

6       A    I believe we had two weeks to complete it.

7    Gave the officers two weeks.

8       Q    And did you see the letter when it was complete

9    and before it was submitted?

10      A    I don't recall.

11      Q    Have you ever seen the completed letter?

12      A    Yes.

13      Q    Do you recall when you first saw the completed

14   letter?

15      A    I don't recall.

16      Q    Did you ever speak with Mr. Ramos about any --

17   strike that.

18           What's your understanding as to how the letter

19   was submitted and to whom?

20      A    My understanding it was submitted to the city

21   manager.

22      Q    And by whom, if you know?

23      A    By Christopher Ramos.

24      Q    And was it your understanding that he did that

25   in person?

1          Q     And was that one of the things that the

2     membership of the POA wanted to occur?

3          A     Yes.

4          Q     Why did you want the association to take a vote

5     of no confidence?

6          A     Well, there's several reasons behind that.

7          Q     Okay.  Tell me what they are.

8          A     I felt that his leadership was not appropriate

9     for the direction I believe our city should be doing.  I

10    watched several careers be terminated prior to this

11    meeting.  It wasn't just myself.  It was several other

12    individuals that were in fear of his management.

13    Several people have -- as I said, were being overly

14    disciplined and their careers attacked.

15         Q     Any other reasons that you had for recommending

16    a vote of no confidence at that point?

17         A     Just I think his choices in his promotional --

18    the people he was promoting, he was promoting then

19    turning around and demoting and constantly promoting

20    people with less experience for the job all based on, I

21    guess, education at that point.

22         Q     Did you have any other reasons for proposing

23    the vote of no confidence at that point?

24         A     Those were the main things, the concern for the

25    fact that my family lives in this city.  I have friends

7

```
 1   and family members that live in this city and working
 2   under certain supervisors that have no experience doing
 3   the job in the field and having this discussion before
 4   with him in the past, my concerns with the fact that his
 5   belief is, if they don't know the answer, they'll pick
 6   up the phone and call him.  That's why he picks those
 7   people.
 8       Q    All right.  And who were the officers that you
 9   referred to when you say several careers had been
10   terminated?
11       A    There's Karen Nolett, Tony Negrette.  I'm
12   trying to -- there's just -- there's Rod Garcia,
13   Frank Velasquez, not terminated but demotions on those
14   two.  There's -- sorry.  I'm not recalling.  I'm trying
15   to think back to the date prior to that who was all
16   involved.
17       Q    And are those also the people that you referred
18   to as having been overly disciplined?
19       A    Some of which, yes.
20       Q    Okay.  And who were the others that you felt
21   had been overly disciplined at that point?
22       A    Well, at that point I know that Tommy
23   D'Alessandro was being evaluated.  Officer Steward.
24   Corporal Ortiz had already been removed from his
25   position at one point and reinstated.  Let me think.
```

```
 1  Oh, Jarod Rutkoff had been an issue with administration,
 2  had his problems with administration.  You know, it gets
 3  to a point where there's several people going through
 4  several different things, and it -- when it becomes a
 5  large percentage of our department, it becomes a
 6  concern.
 7            MS. HARPER:  Can we take a quick break?
 8            MR. CUNNINGHAM:  Sure.
 9                  (A brief recess was taken.)
10                  (The record was read as requested.)
11            MS. HARPER:  I think his last question was
12  overly disciplined.
13  BY MR. CUNNINGHAM:
14     Q    And these concerns about people who had been
15  terminated or demoted or overly disciplined were
16  concerns that existed at the time that the meeting
17  occurred in April of 2011; correct?
18     A    Correct.
19     Q    And have a number of those individuals, to your
20  knowledge, since been terminated?
21     A    Yes.
22     Q    And did those individuals share with you the
23  reasons why they were terminated?
24     A    No.  I mean -- no.
25     Q    And the people who had been terminated or
```

9

```
 1    word --
 2         A    No.
 3         Q    -- any of the statements he made to you?
 4         A    No, sir.
 5         Q    Well, prior to April, 2011 had you ever applied
 6    for and been denied a promotion?
 7         A    I applied for sergeant several times with this
 8    department.
 9         Q    And you had not promoted?
10         A    I had not promoted, sir.
11         Q    Did you ever grieve that in any fashion?
12         A    No, sir.
13         Q    Do you recall when it was that you first
14    applied for a promotion to sergeant after you joined the
15    department in 2007?
16         A    It was the first -- it was within, I think,
17    three months of being here.  I don't remember the exact
18    dates.  It must have been in November or December of
19    2007.
20         Q    When was the first time -- strike that.
21              It's my understanding that the first time that
22    you were advised that you were to be disciplined by the
23    department was when you received a Notice of Intent on
24    or about July 13, 2011; is that correct?
25         A    Correct.
```

```
 1         Q.    And was it your understanding that the basic
 2    underpinning of that Notice of Intent was that you had
 3    been subpoenaed to court and had been late in arriving
 4    at court while you were on an FMLA leave?
 5         A     Yes.
 6         Q     Yes?
 7         A     Yes.
 8              MR. CUNNINGHAM:   Well, before we start in on
 9    some questions, I've got -- what I've done, counsel,
10    just so that -- I'll let you know what I'm doing here.
11    I've done it the same with the other deponents today is,
12    I have a set of documents that I would like to
13    reference.   They were part of the materials that were
14    produced by us in our Rule 26 disclosures.
15              MS. HARPER:   Okay.
16              MR. CUNNINGHAM:   And because they are
17    confidential personnel documents, my intent is not to
18    attach them to a deposition transcript.   If you have no
19    objection, I've -- like I say, I have a set for you.   In
20    the upper left, on this set at least, they have some
21    Bates numbers, Davis 0001 through 00023.   And if that's
22    acceptable to you, then we'll reference the documents by
23    Bates number.   Then since we have a set, we won't have
24    to attach them.
25              Obviously one of the things I want to avoid is
```

1    Q    -- through Page 014, that's a Notice of Intent.

2    And the notice was at some point given to you, and you

3    signed that you had received it; is that correct?

4    A    Correct.

5    Q    And if we look at Page 013 the signature on the

6    signature line for Scot Davis with a date of 7-13, that

7    is your signature, sir?

8    A    Correct, sir.

9    Q    And in the Notice of Intent it indicated that

10   the actions that were recommended were 40-hour

11   suspension, a reduction in rank and a removal from a

12   detective assignment; is that correct?

13   A    Correct.

14   Q    And then after you received that notice, did

15   you attend what's commonly called a Skelly conference

16   with the chief?

17   A    Yes, I did.

18   Q    And your counsel were present for that meeting?

19   A    Yes.

20   Q    And the court reporter was present and prepared

21   a transcript of the proceeding?

22   A    No.

23   Q    Was it recorded?

24   A    It was recorded.

25   Q    All right.  Have you ever seen a transcript of

1    the proceeding?

2        A    Yes.

3        Q    And the Notice of Discipline after Skelly

4    hearing, which starts at Page 14 and goes to Page 15,

5    you received a copy of that document on or about the

6    28th of July, 2011?

7        A    Correct.

8        Q    And signed for it on Page 15?

9        A    Yes.

10       Q    And the proposed discipline -- at that point

11   several of the seven counts in the Notice of Intent were

12   dismissed; is that correct?

13       A    Correct.

14       Q    And then some were sustained?

15       A    Correct.

16       Q    And the proposed discipline was a 40-hour

17   suspension to be held in abeyance for 12 months and

18   dismissed if there were no sustained complaints of

19   misconduct of the same or similar nature during that

20   period, which shows -- that's at the bottom of the first

21   page of the document?

22       A    Correct.

23       Q    And that although you would be removed from

24   your assignment as a corporal, you would continue to

25   receive pay as a corporal during that 12-month period;

13

```
 1    is that correct?

 2         A    Correct.

 3         Q    It was further indicated that you would be

 4    removed from your assignment as a detective but you

 5    would be eligible to reapply in either six or 12 months

 6    based on matters that are discussed earlier in the

 7    letter; is that correct?

 8         A    Correct.

 9         Q    Subsequent to that -- well, I'm sorry.

10              Now, one of the things that you were

11    disciplined for was -- sorry.  Let me back up.

12              Was there a point in time when the discussion

13    of the outstanding subpoena was ongoing between yourself

14    and Sergeant Keyser, that you had some discussions with

15    him about the fact that you needed to go to the

16    courthouse in compliance with the subpoena?

17         A    Sergeant Keyser did notify me at that point.

18         Q    K-e-y-s-e-r.  And was there any point in time

19    when you told Sergeant Keyser after that conversation

20    that you apologized for the way that you had spoken with

21    him?

22         A    I -- I apologized for raising my voice, yes,

23    sir.

24         Q    And if we look at Page 16 of the documents you

25    have there, it's a copy of the page of the transcript of
```

14

1    the Skelly hearing, and starting at Line 2 where it

2    says, "Corporal Davis:  You know, to be quite honest I

3    apologized to Mark for my behavior on the phone.  I was

4    frustrated.  By all means I spoke to him about it," at

5    some point you had a conversation with him and

6    apologized to Sergeant Keyser; is that correct?

7         A    Yes, sir.

8         Q    Now, you went ahead and, per your right,

9    appealed your discipline; is that correct?

10        A    Yes.

11        Q    And then if you would take a look at Page 19 of

12   the material, it's a document entitled "Award of

13   Arbitrator."  And in that award, the arbitrator states

14   that you are to be reinstated to your former rank and

15   assignment and that you are to be fully reimbursed for

16   back pay from the date of imposition of the discipline;

17   is that correct?

18        A    Correct.

19        Q    And after this award was issued, did you ever

20   contact anyone at the department to make arrangements to

21   receive any back pay or reimbursement that you were

22   entitled to?

23        A    No.

24        Q    Did you believe at the time that this award was

25   issued in February of 2012 that there was back pay that

15

1   was owed to you?

2      A    At the time I believed that I would have

3   accrued overtime working in the detective bureau.

4      Q    Okay.  And did you ever make a request to

5   anyone at the City to pay an amount of overtime?

6      A    No.

7      Q    Is there a reason why not?

8      A    I don't recall.

9      Q    When you were working in the detective bureau,

10  did you have a predictable amount of overtime, or was

11  overtime based on what happened?

12     A    There was a predictable amount of on-call pay.

13  Every -- I believe it was every three weeks you were

14  assigned to be on call for a week, which was a hundred

15  dollars.  It's just no way of telling if you're going to

16  be called in for overtime or have to stay longer on your

17  case.

18     Q    Right.  And as far as the on-call pay, you say

19  every three weeks you would be entitled to a hundred

20  dollars in on-call pay?

21     A    Yeah.  At the time I believe it was every three

22  weeks.

23     Q    All right.  And then after the award came out,

24  if you look at Page 20 -- so it's two or three pages

25  from the bottom.  It looks like that.  And you have that

1b

1    in front of you, sir?  Sir, do you have that in front of

2    you?

3        A    Yes.  I'm sorry.

4        Q    Okay.  And it's an e-mail from you to the chief

5    dated February 21st, 2012?

6        A    Correct.

7        Q    And at this point in time the award of the

8    arbitrator had come out which said you were entitled to

9    be reinstated to your corporal rank and to go back to

10   your prior assignment in the detective bureau; is that

11   correct?

12       A    Correct.

13       Q    And in this e-mail you indicated you would

14   prefer to remain as a patrol corporal, and you specified

15   a shift which you would prefer to work; is that correct?

16       A    Correct.

17       Q    And if we look at the next page, Page 21,

18   that's a memo from the chief the following day,

19   February 22, confirming that you are reassigned to your

20   corporal position and assigned to the patrol shift that

21   you had requested; is that correct?

22       A    Correct.

23       Q    Now, since that time -- oh, and then one last

24   thing.  If we look at Page 22 and 23, this is a letter

25   from the Beaumont Police Department dated September 11,

17

1    Q    And that's just by adjusting one of those seven

2  shifts basically to adapt for that?

3    A    Correct.

4    Q    As a corporal do you have supervisory

5  responsibilities?

6    A    No.

7    Q    How about mentorship?  Has that been any part

8  of your work as a corporal?

9    A    That was the initial intent of the corporal

10  position, yes, sir.

11    Q    Since February of 2012 when you were placed as

12  a corporal in patrol pursuant to your request, have you

13  requested any other special assignments or different

14  assignments other than working in patrol?

15    A    No.  Oh, I'm sorry.  Can I correct that?  I did

16  put in an interest for the impact teams when they put

17  together impact teams, and I was actually assigned to

18  that.

19    Q    What's the impact team?

20    A    At the time -- well, now we're down to one, but

21  they're a specialized team to go out and work in the

22  field as quasi-detectives, I guess, and work areas and

23  that are, you know, right now hotspots for crime,

24  criminal activity, look for people with warrants, also

25  follow up on certain cases that are assigned to them

1  that the detective bureau are unable to follow, can't

2  get to.

3      Q    When was it approximately that you applied for

4  that assignment?

5      A    I don't recall the date.  Back -- I don't -- do

6  you remember when we put the --

7           MR. CUNNINGHAM:  You can't ask him.  He's not

8  under oath.

9           MS. HARPER:  Can't ask him.

10          THE WITNESS:  I don't remember the dates when

11  we -- you know, I didn't take the position based on

12  another corporal having family issues with his kids and

13  soccer and his shift.  He wouldn't be able to work it,

14  so I swapped with him so he was able to take his kids to

15  soccer and do the family thing.

16  BY MR. CUNNINGHAM:

17      Q    At one point you had applied for the

18  assignment, and it had been offered to you, but you

19  chose to decline it so that the other corporal could

20  work out his schedule issues?

21      A    Correct.

22      Q    Have you been disciplined since July of 2011?

23      A    I received a letter of reprimand, yes, sir.

24      Q    What was that in connection with?

25      A    It was in connection to a commander's personal

```
 1    describe what had occurred at the meeting?

 2        A    Yes.  Some of the POA members were updated as

 3    to what occurred at the meeting.

 4        Q    Did you, yourself, keep any notes of what

 5    occurred at the meeting for your own use?

 6        A    No.

 7        Q    When you prepared the portions of the

 8    evaluation that we saw in Pages 5 through 9 of the First

 9    Amended Complaint, did you type those up on a computer

10    as opposed to writing them out in longhand?

11        A    No.  I had typed them on a computer.

12        Q    Did you e-mail them to someone so they could

13    incorporate them into a document?

14        A    I don't recall if I e-mailed them.  I believe I

15    printed them out and took them and hand delivered them

16    to Chris Ramos.

17        Q    Now, at the time of this meeting Chris Ramos

18    was a corporal; correct?

19        A    Yes.

20        Q    Did he ever promote to sergeant?

21        A    Yes.

22        Q    Do you recall when he promoted to sergeant?

23        A    No.

24        Q    Did he promote to sergeant after the letter was

25    delivered to the city manager?
```

1       A       Yes.

2       Q       Now, back in August of 2011 it's my

3   understanding that you had some surgery for a shoulder

4   injury?

5       A       Correct.

6       Q       And that was not a work-related injury?

7       A       No, sir.

8       Q       And you were off work for a while and then came

9   back on light duty; is that correct?

10      A       Yes, sir.

11      Q       At the point in time that you came back on

12  light duty, had you exhausted your paid leave?

13      A       I don't recall.  Are you talking about sick

14  time bank, banked hours?

15      Q       Let's talk about that first.

16      A       I know I was -- yeah, I think I exhausted all

17  of my sick-time hours.

18      Q       And at the point in time that you returned to

19  light duty, did you have an understanding as to what

20  duties you would perform while you were on light duty?

21      A       It was explained to me what I would be doing

22  when I was on light duty, yes, sir.

23      Q       Okay.  Who was it that explained your duties to

24  you?

25      A       Commander Beard.