# EXHIBIT "2"

4817-9234-1774.1

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

    SCOT DAVIS; BRIAN FORD; JEREMY    )
 4  HARRIS,                           )
                                      )
 5                    PLAINTIFFS,     )
                                      ) CASE NO.
 6            VS.                     ) CV 12-4990 ABC (SHx)
                                      )
 7  CITY OF BEAUMONT, A MUNICIPAL     )
    CORPORATION; FRANK COE,           )
 8  INDIVIDUALLY AND AS CHIEF OF      )
    POLICE OF THE BEAUMONT POLICE     )
 9  DEPARTMENT; AND DOES 1 THROUGH    )
    10 INCLUSIVE,                     )
10                    DEFENDANTS.     )
    _____)
11

12

13

14

15              DEPOSITION OF BRIAN FORD

16                 FRIDAY, MAY 24, 2013

17

18

19

20  FILE NO. 20204-B

21  REPORTED BY:  DIANE CARVER MANN, CLR, CSR NO. 6008

22

23

24

25
```

```
 1      A    No.
 2      Q    Have you ever read the Complaint that was filed
 3 on your behalf or the First Amended Complaint that
 4 followed?
 5      A    Yes.
 6      Q    And to prepare yourself for today's deposition,
 7 have you looked at anything in writing?
 8      A    No.
 9      Q    For example have you looked at any documents
10 you received in connection with any disciplinary
11 matters --
12      A    No.
13      Q    -- in order to refresh your recollection?
14      A    No.
15      Q    Okay.  Now, at the time that you -- strike
16 that.
17           When were you hired by the City?
18      A    March, I believe, 27th or 28th, 2008.  I
19 believe that's correct, eight.
20      Q    When you were hired, into what position were
21 you hired?
22      A    Police officer.
23      Q    Had you any prior experience as a peace officer
24 before coming to work for Beaumont?
25      A    No, I did not.
```

```
 1    Q    Where did you go to the academy?
 2    A    San Bernardino Sheriff's Academy, the six-month
 3  program.
 4    Q    Did you put yourself through the academy?
 5    A    Yes, I did.
 6    Q    And at the present time your rank is police
 7  officer?
 8    A    That is correct.
 9    Q    Have you ever been promoted from police officer
10  to any other rank during the time that you've been with
11  the Beaumont Police Department?
12    A    No.
13    Q    Have you ever applied for any promotions while
14  employed by the department?
15    A    No.
16    Q    Have you worked any special assignments other
17  than patrol assignments while working for the department
18  up to this point?
19    A    No.
20    Q    Have you applied for any such assignments?
21    A    No.
22    Q    Now, are your patrol cadres identified by shift
23  or by team?  How does that work?
24    A    Teams or shifts.  Basically we've changed quite
25  a bit, but right now we have different shifts, and then
```

```
 1  possibly Ortiz, but I could be wrong because we had a
 2  lot of shifts going on, but I know Davis was one of the
 3  main people.
 4      Q    Do you know who were the board members of the
 5  BPOA back in April, 2011?
 6      A    I can't specifically say.  I can't give an
 7  answer, unfortunately.
 8      Q    Do you recall if Chris Ramos was president of
 9  the board at that point?
10      A    That sounds right.  He may have been, but I
11  don't know 100 percent certain.
12      Q    All right.  And how long did that meeting last,
13  if you recall?
14      A    Just as a guess I would say maybe an hour.
15      Q    Was there any discussion of holding a
16  no-confidence vote as to the chief during that meeting?
17      A    Yes.
18      Q    And do you recall who proposed that?
19      A    I don't know if it was only one person.  I know
20  Davis had spoke out and was requesting it.  He was very
21  adamant about it.
22      Q    Did he say why it was he was proposing?
23      A    Because of past incidents that had happened.
24      Q    What sort of past incident was he talking
25  about?
```

1  A    Past discipline. I believe that's what he was
2  talking about.
3  Q    As you recall it, was he discussing discipline
4  that he had been the subject of or discipline that had
5  befallen other people?
6  A    I think it was overall discipline, the
7  direction of where the department was going. But
8  unfortunately I can't verbatim what was said on his
9  behalf.
10 Q    Did you make any notes about anything that
11 occurred at that meeting at any time?
12 A    No, I didn't make any notes.
13 Q    What was the outcome of his proposal that a
14 no-confidence vote be held?
15 A    There was some individuals that were reluctant
16 about the vote of no confidence. We also discussed the
17 chief's review. I think that's the same time that we
18 discussed that as far as completing the chief review.
19 Q    When you say "the chief's review," what do you
20 mean by that?
21 A    Basically people wrote a review of the chief.
22 Q    And did they write it right, then, during the
23 meeting?
24 A    No.
25 Q    Did you write anything for the chief's review?

1    A    I did not.

2    Q    Now, at the point in time that that meeting

3  occurred in September -- I'm sorry -- in April, 2011, do

4  you know if there was any discussion going on about

5  possible promotions of persons to sergeant positions at

6  the department?

7    A    I don't recall.

8    Q    Was there a reason that you didn't write

9  anything as part of the chief's review?

10   A    I was scared of possible retaliation.

11   Q    And why is that?

12   A    Just past behaviors that I had observed.

13   Q    And what were they?

14   A    Back when we switched from four tens -- or

15 actually from three twelves to four tens, and then some

16 of the individuals, some of the POA were unhappy with

17 the four tens, we requested they go back to three

18 twelves.  At that point it was decided that instead of

19 going back to that, we were going to be put on staggered

20 shifts.  And my perception of that was it was

21 retaliation.

22       After that there was another incident with a

23 smoking, like, thing where the City wanted it to be

24 where we could no longer smoke when you were hired, but

25 they would grandfather the old people.  And I think it

1   A   I don't recall.

2   Q   Do you know if there were any mitigating
3   factors in terms of his loss of the cell phone that
4   didn't apply in your situation?

5   A   No.

6   Q   Approximately when was it that you received the
7   written reprimand, would you say?

8   A   I can't give a specific date.

9   Q   Would it have been more or less than a year
10  before that meeting in April of 2011?

11  A   Possibly a year before, but I can't give you an
12  exact, unfortunately.

13  Q   And after that written reprimand, when was the
14  next time that you were subject to any discipline with
15  the department?

16  A   I think I banged the front of a car when I was
17  backing up, and that was the only other issue that I've
18  had that I recall, anyways.

19  Q   And do you recall what form of discipline you
20  received for that?

21  A   Just a letter of counseling.

22  Q   That's basically for an avoidable damage to a
23  unit?

24  A   Yeah.

25  Q   And after that when is the next time that you

1  were disciplined?
2     A   I want to say it was the -- my I.A., internal
3  investigation.
4     Q   That would have been approximately August 16th
5  of 2011?
6     A   Yes.
7     Q   So between the date of the meeting in April of
8  2011 and August 16th, 2011 had you received any form of
9  discipline from the department?
10    A   From -- reclarify.
11    Q   From the date of the meeting in April of 2011
12 up to August 16th or 17th, whatever date it was in
13 August when you had this I.A. that began, during that
14 four-month period had you received any discipline from
15 the department?
16    A   I don't recall.
17    MR. CUNNINGHAM:  And as we talked about at the
18 last deposition, I have a set of documents pulled from
19 our Rule 26 disclosures which come from the personnel
20 file materials, and rather than get those in a position
21 where they might become public records if the
22 depositions are lodged, we'll just refer to them by
23 their Bates number.  And everybody has a set, and that
24 way we don't have to attach the actual copies to the
25 transcript.

1  Q    Because of the nature of patrol duties, the
2  unit that you operate during one shift is operated by
3  someone else during another shift?
4  A    That's correct.
5  Q    And had you been told by any members of the
6  other shifts that the audiovisual system in your unit
7  was not functioning properly?
8  A    No.
9  Q    Did you ever learn whether the audio was
10 working or not -- strike that.
11      Did you ever learn whether any audio was
12 captured as to the traffic stop involving the subject of
13 this citizen complaint?
14 A    I believe they reviewed it and advised I had no
15 audio.
16 Q    If you turn to Page 32 in the packet of
17 material, that's a Notice of Intent to discipline dated
18 September 27th, 2011. Have you ever seen this document
19 before that's several pages in length and goes to
20 Page 37?
21 A    I believe I've seen it before.
22 Q    All right. And the signature that appears for
23 Brian Ford on Page 36 is Page 5 of the document itself,
24 that's your signature?
25 A    Yes.

```
 1      Q    And you signed it as received on
 2  September 30th, 2011?
 3      A    It looks that way.
 4      Q    And was this the first time that you were
 5  advised of the outcome or at least the proposed outcome
 6  of the internal affairs investigation?
 7      A    I believe this was the first time I was advised
 8  of what they recommended or what they were saying it
 9  was.
10      Q    All right.  And the recommended discipline at
11  Page 436, which is Page 5 of the document above the
12  black line is a 160-hour work suspension without pay,
13  which would essentially be a month off work; is that
14  correct?
15      A    Yes.
16      Q    And after you received that notification, did
17  you set up a Skelly meeting with the chief?
18      A    Yes, I did.
19      Q    And was your attorney present with you at that
20  meeting?
21      A    Yes, he was.
22      Q    And was the meeting recorded?
23      A    Yes, it was.
24      Q    Have you ever read all or a part of the
25  transcript of the recording?
```

10

| | | |
|---|---|---|
| 1 | A | No, I have not. |
| 2 | Q | Are you aware that such a transcript exists? |
| 3 | A | It may.  I don't know. |
| 4 | Q | All right.  Now, take a look, if you would, at Page 38.  Do you recall receiving a copy of this letter? |
| 6 | A | I do. |
| 7 | Q | And at the bottom of the page the signature for Brian Ford, that's your signature? |
| 9 | A | Yes, it is. |
| 10 | Q | And the date of receipt is November 4, 2011? |
| 11 | A | Yes. |
| 12 | Q | And so that would be the day that you received it? |
| 14 | A | Yes. |
| 15 | Q | And is it your understanding that during the course of that meeting there was a discussion about resolving the discipline matter? |
| 18 | A | Yes. |
| 19 | Q | By settlement?  Yes? |
| 20 | A | Yes. |
| 21 | Q | And in fact you were provided with a copy of the settlement agreement along with the Skelly letter?  And that would be at Pages 38 through 40; is that correct? |
| 25 | A | That's correct. |

```
 1      Q    And this document bears your signature, does it
 2  not, on Page 40?
 3      A    Yes.
 4      Q    And dated November 4, 2011 being the date that
 5  you signed it?
 6      A    That's correct.
 7      Q    And also has the signature of the chief on the
 8  same date?  Yes?
 9      A    Looks to be.  I don't know.  It's kind of
10  chunked off a little bit, but it looks like his
11  signature.
12      Q    And was it your understanding at the time you
13  signed this document that you were resolving the
14  discipline issue between yourself and the department?
15      A    That I was resolving the issue?
16      Q    Yes.
17      A    Yes.
18      Q    All right.  And what were the terms -- strike
19  that.
20           Initially you had been advised that the
21  recommended discipline was 160 hours of suspension
22  without pay; is that correct?
23      A    That's correct.
24      Q    And under the terms of this agreement that
25  suspension was reduced to 12 hours, and that was to be
```

```
 1    held in abeyance for one year; is that correct?
 2        A    That's correct.
 3        Q    And do I understand, then, correctly that you
 4    were not actually suspended without pay?
 5        A    That's correct.
 6        Q    And then it was also stated on Page 39 at
 7    numbered Paragraph 3, "Upon successful completion of the
 8    one-year time period and provided there are no pending
 9    or additional disciplinary actions during the year, the
10    suspension will be converted to a written reprimand and
11    placed in the personnel file."
12             Correct?
13        A    Correct.
14        Q    And based on your recollection was there any
15    additional or pending disciplinary proceedings against
16    you during the year following the signing of the
17    settlement agreement?
18        A    Additional to this, or just another write-up
19    after?
20        Q    Well, not related to this incident or the
21    incidents described in this discipline, but were you
22    written up for anything in addition --
23        A    To this incident.
24        Q    -- new and different between November 4, 2011
25    and November 4, 2012?
```

```
 1      A    Yes.
 2      Q    And what was the nature of that one?
 3      A    I believe it was a week after this incident or
 4 maybe two weeks.  It was during a briefing.  I had
 5 received a citation correction during the briefing, and
 6 I forget.  It was a section that was changed in 2012.  I
 7 had asked around the round table if anybody knew what
 8 the correct new section was.  Sergeant Velazquez said
 9 she didn't know but she'd look into it for me.  I think
10 about a week after that I received a write-up for asking
11 the question and I should have been able to find the
12 answer on my own.
13      Q    When you say you received a write-up for it,
14 was it your understanding that that was a formal written
15 reprimand?
16      A    I received a letter of counseling for it.
17      Q    And that's non-punitive; correct?
18      A    I believe so.
19      Q    Other than that letter of counseling are you
20 aware of any other disciplinary actions that were taken
21 against you or were pending during that one-year period?
22      A    No.
23      Q    And in numbered Paragraph 6 at Page 40, which
24 is the last page of the set of documents, Paragraph 6
25 states, "By signing this settlement agreement Ford
```

```
 1   specifically acknowledges and agrees that he waives his
 2   right to any further appeal of this disciplinary
 3   action."
 4           Is that correct?
 5       A   Yes.
 6       Q   And at the time that you -- strike that.
 7           The terms of the settlement agreement that you
 8   signed on November 4, were those discussed during the
 9   Skelly meeting?
10       A   They were loosely discussed, but I believe the
11   attorney and the chief had drafted something, and then
12   they looked it over and then submitted it to me, and
13   then I looked it over and signed it.
14       Q   All right.  So you signed the with the advice
15   of your counsel?
16       A   Yes.
17       Q   Now, during the Skelly discussion that you had
18   with the chief, was the subject of your having been
19   discourteous to your sergeant something that was
20   discussed?
21       A   I don't recall all the details of that meeting.
22       Q   Is there anything about the meeting that you
23   recall?
24       A   I remember little details of it, but I'm not
25   going to remember every detail of it.
```

```
 1    Q    So it would be the written reprimand and the
 2   potential that you might have to serve the 12-hour
 3   suspension?
 4    A    Yes, within the first year, which has already
 5   passed.
 6    Q    Right. And so you never had to actually serve
 7   that suspension?
 8    A    No, I did not.
 9    Q    Did you ever have to -- strike that.
10         Since the date of that Skelly, have you applied
11   for any promotions or new or special assignments within
12   the department?
13    A    No.
14         MR. CUNNINGHAM: I need to use the restroom,
15   and then we'll probably be able to wrap it up real
16   quickly. Give me just a couple of minutes.
17              (A brief recess was taken.)
18         MR. CUNNINGHAM: Okay. Back on the record.
19   BY MR. CUNNINGHAM:
20    Q    During your conversation with the subject of
21   the traffic stop and Sergeant Velazquez, was that in the
22   lobby of the --
23    A    Yes, it was.
24    Q    -- department? And during that conversation
25   did you and the subject of the call or the stop talk
```

```
 1   about whether or not you could have towed his vehicle?
 2        A    I believe we talked about that.
 3        Q    When you were there at the traffic stop, did
 4   you tell the subject of the stop that you had the right
 5   to tow his vehicle?
 6        A    Yes.
 7        Q    Did you ever determine whether in fact that was
 8   true?
 9        A    I don't believe it was true.  I actually
10   researched it after the fact, but at the time I believed
11   it was true.
12        Q    Okay.  And when the subject of the call came to
13   the lobby, was that one of the issues he wanted to talk
14   about with you?
15        A    I believe so.
16        Q    And did Sergeant Velazquez advise you that
17   there was an issue about whether you would have had the
18   right to tow his vehicle at any point in time around
19   that conversation with the subject?
20        A    While in the room?
21        Q    Let's say before you went into the room or
22   while you were in the room.
23        A    I believe Velazquez actually asked Autrey, and
24   then we talked about it briefly before going in there.
25        Q    Okay.  So was Corporal Autrey there as well?
```

```
 1  STATE OF CALIFORNIA              )
 2  COUNTY OF RIVERSIDE              )  ss.
 3
 4       I, Diane Carver Mann, C.S.R. No. 6008, in
 5  and for the State of California, do hereby certify:
 6       That prior to being examined, the witness named
 7  in the foregoing deposition was by me duly sworn to
 8  testify to the truth, the whole truth, and nothing but the
 9  truth;
10       That said deposition was taken down by me in
11  shorthand at the time and place therein named and
12  thereafter reduced to typewriting under my direction, and
13  the same is a true, correct, and complete transcript of
14  said proceedings;
15       That if the foregoing pertains to the original
16  transcript of a deposition in a Federal Case, before
17  completion of the proceedings, review of the transcript
18  (X) was ( ) was not required.
19       I further certify that I am not interested in the
20  event of the action.
21       Witness my hand this 30th day of May,
22  2013.
23              Diane Carver Mann
24              Certified Shorthand Reporter
25              for the State of California
```