# EXHIBIT "3"

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3

4   SCOT DAVIS; BRIAN FORD; JEREMY    )
    HARRIS,                           )
5                                     )
                       PLAINTIFFS,    )
6              VS.                     )  CASE NO.
                                      )  CV 12-4990 ABC (SHx)
7                                     )
    CITY OF BEAUMONT, A MUNICIPAL     )
8   CORPORATION; FRANK COE,           )
    INDIVIDUALLY AND AS CHIEF OF      )
9   POLICE OF THE BEAUMONT POLICE     )
    DEPARTMENT; AND DOES 1 THROUGH    )
10  10 INCLUSIVE,                     )
                                      )
11                     DEFENDANTS.    )
                                      )
12  _____)

13

14

15              DEPOSITION OF JEREMY R. HARRIS

16                  FRIDAY, MAY 24, 2013

17

18

19

20   FILE NO. 20204-C

21   REPORTED BY:  DIANE CARVER MANN, CLR, CSR NO. 6008

22

23

24

25

1  date of the letter being approximately April 20, 2011,

2  does that assist you at all in fixing a time as to when

3  that occurred?

4      A    You said that was 2011?

5      Q    You were hired, you said, in January of 2009.

6  The letter was in April of 2009, so was the alternative

7  discipline at some point in time between those two

8  things?

9      A    Yes.  I would say 2010, about March or April.

10  I don't know exactly.

11     Q    And at the time that that alternative

12  discipline was done, what was your rank at that point?

13     A    Corporal.

14     Q    Now, between the time that that alternative

15  discipline was imposed and when the -- strike that.  Let

16  me back up.

17          It will happen to me a couple of times during

18  the course of your deposition, and having taken two

19  depositions before yours the morning, sometimes it will

20  occur to me, I wonder if I've asked this witness this

21  question or not.  So I apologize for that.

22          But were you present for a meeting of the

23  Beaumont Police Officer's Association where the

24  performance of the chief was discussed in or about April

25  of 2011?

1        A     Yes.

2        Q     At the time that that meeting took place, were

3    you a member of the board of the POA?

4        A     No.

5        Q     Do you recall who the board members were at

6    that time?

7        A     I want to say the president was Chris Ramos.

8    We've gone through a few, so I could be wrong.

9        Q     Okay.  Do you recall who any of the other board

10   members were at that time?

11       A     Maybe Liam Doyle, maybe.

12       Q     Do you recall how long that meeting lasted?

13       A     A couple hours.

14       Q     Do you recall what the topics of conversation

15   were during the meeting this April of 2011 meeting?

16       A     The main topic was whether or not we were going

17   to do an evaluation on the chief as a POA.

18       Q     Do you recall if anyone suggested or discussed

19   the possibility of a vote of no confidence?

20       A     Yeah.  There was a mention of that.

21       Q     Do you recall if that issue ever went to a vote

22   during the meeting?

23       A     I don't believe it did.

24       Q     And during the course of the meeting was any

25   decision made as to whether some kind of evaluation of

1    on the discussion at the meeting that the evaluation

2    would be put in writing and submitted to someone at the

3    City?

4         A    Yes.

5         Q    Was it your understanding that the evaluation

6    content or contributions by the members of the

7    association would be anonymous?

8         A    Yes.

9         Q    Were you part of the discussion as to whether

10   the complaints or evaluations should be anonymous or

11   not?

12        A    Yes.

13        Q    Okay.  And what did you contribute to that

14   discussion?

15        A    Let's see.  I didn't -- I didn't care either

16   way if they were anonymous or not.  But we did have a

17   vote, and a majority was to have it anonymous.

18        Q    So the vote was not unanimous, but the majority

19   voted for anonymity; is that correct?

20        A    Yes.

21        Q    Now, in the First Amended Complaint between

22   Pages 5 and 9 it's basically all, I believe, under

23   Paragraph 16 -- yes.  There are a number of quotations

24   that are reputed to come from the letter.  And Officer

25   No. 7 is identified as yourself.  And if you could just

4

1    take a look at the portions of the letter that are
2    headed by Officer No. 7 and confirm for me that those
3    represent your contribution, I would appreciate it.
4         A    Is there more back there?
5         Q    No.   That's all of it.   So the Officer No. 7
6    comments, are those comments that you put into your
7    evaluation?
8         A    Yes.
9         Q    Now, in the comment that appears on Page 6, it
10   indicates that only three people had put in for the last
11   sergeant's test; is that correct?
12        A    Yes.
13        Q    And were you one of those three?
14        A    No.  And that was the last one from there.
15   There's been a couple of other ones.
16        Q    I understand.  But at the time you wrote this
17   particular document, there had been a recent promotions
18   process for sergeants, but your understanding was that
19   only three people had applied for it; is that correct?
20        A    That's correct, yes.
21        Q    And again you were not one of those three at
22   that point?
23        A    No, I wasn't.
24        Q    At the time that that letter had been -- strike
25   that.

```
1              At the time the evaluation was done and then

2    the letter was submitted to the City, at that point in

3    time had you applied for any promotions within the

4    department?  So from January, 2009 through April of 2011

5    had you applied for any promotions at that point?

6        A    For sergeant only are you talking about?

7        Q    Well, for any position.  I imagine the next one

8    up from corporal would be sergeant.

9        A    I applied for detective.  I don't remember

10   exactly when that was, but it was sometime around there.

11       Q    Okay.  And in April of 2011 what was your

12   assignment?

13       A    Police corporal.

14       Q    Okay.  And were you assigned as a detective, as

15   a patrol officer?  What was your assignment?

16       A    Patrol.

17       Q    Okay.  And do you know when it was that you

18   applied for a detective's position?

19       A    I don't remember exactly.

20       Q    Was there a point in time when you were

21   appointed to a detective's position?

22       A    Yes.

23       Q    And when was that?

24       A    I believe it was in May before the discipline,

25   so what year that was --
```

```
 1        Q      May of 2011?

 2        A      Yes.

 3        Q      Did you have to make a formal written

 4   application for that assignment?

 5        A      A memo, memorandum.

 6        Q      Do you recall when the memo was sent in by you

 7   initially?

 8        A      No.

 9        Q      Do you know how long it went between the date

10   that you sent in the memo and your being advised that

11   you were being assigned to the detective's position?

12        A      It was a few months, because I did a memo, and

13   then there was an interview process, and then I didn't

14   get the position, so I stayed on the list.

15        Q      So you applied a couple of months before you

16   received the assignment in approximately May, 2011?

17        A      Yes.

18        Q      Do you recall who it was that interviewed you

19   for the position?

20        A      Sergeant Josh Ellsworth and Sergeant

21   Darren Wann.

22        Q      How do we spell Sergeant Wann's last name?

23        A      W-a-n-n.

24        Q      Anyone else involved in the interview?

25        A      There was.  I can't remember who it was,
```

1      Q     At some point in time in June, 2011 after you

2   joined the detective bureau, did you receive a copy of

3   an e-mail regarding Vehicle Code compliance by members

4   of the department?

5      A     Yes.

6      Q     I'm going to ask you to take a look at -- I

7   have two copies this time, and just for the record, as

8   we discussed at the other two depositions these are

9   portions of sergeant Harris's personnel file.  And in

10   order to maintain their confidentiality and avoid the

11   necessity for attaching copies to the transcript, I've

12   provided a copy to counsel and the witness, which have

13   Bates numbers on them.  They are Bates numbers City

14   Harris 0001 through 00012, and then there's a gap, and

15   then we have city Harris 00025 through No. 0029.

16          It turns out when I copied them and had them

17   Bates numbered, there were duplicates, so I pulled the

18   duplicates out.

19   BY MR. CUNNINGHAM:

20      Q     So if you would take a look, sir, at

21   Page No. --  I just had it just a moment ago.  It's Page

22   No. 005 and 006, and this is an e-mail from Frank Coe

23   dated Monday, June 20, 2011, 5:55 p.m.  And did you

24   receive a copy of this e-mail?

25      A     I received an e-mail on my computer.

1    Q    All right.  And when you received it, did you
2    read it over?

3    A    Yes.

4    Q    And did you understand that one of the issues
5    addressed in the e-mail was window tinting on personal
6    vehicles of city hall and police department employees?

7    A    Yes.

8    Q    At the bottom of Page 005, which is the first
9    page of the e-mail, chief states, quote, "I am going to
10   ask everyone to check their vehicles, and if they know
11   they are in violation, address the violation by June 30,
12   2011.  If you are unsure if your vehicle is in
13   violation, please contact me directly, and I will let
14   you know.  If you need the tint removed from your
15   windows, the company that washes our police vehicles can
16   remove the tint for a nominal fee."

17        Next paragraph, "Additionally I would like to
18   remind everyone that they owe it to each other to ensure
19   that we are all holding our co-workers accountable for
20   those actions when those actions may bring discredit to
21   the city we represent.  When defending the City's
22   actions, I am often confronted with the comment that we
23   do not hold ourselves to the same standard we expect of
24   everyone else.  While I know that we believe that we do,
25   can everyone feel comfortable stating this if

1   challenged?"

2         And so that was part of the e-mail that you

3   received; correct, sir?

4       A    Yes.

5       Q    And was it your understanding from that e-mail

6   that between June 20th and June 30th you were to confirm

7   whether your personal vehicles were in compliance with

8   the window-tint provisions of the Vehicle Code?

9       A    Yes.

10      Q    And if you would turn, then, to the first page

11  of the pack of documents of the City Harris 001, there

12  is a memo from Commander Fagan to Chief Coe which

13  discusses tinting of the windows of the pickup truck.

14  Do you see that, sir?

15      A    Yes.

16      Q    And have you received a copy of this document

17  at some point in time in connection with the internal

18  affairs investigation?

19      A    I don't remember this one, but I mean, I'm sure

20  I did.

21      Q    Do you recall being contacted by Commander

22  Fagan about issues relied to the window tinting on a

23  pickup truck on or about July 6th, 2011?

24      A    Yes.

25      Q    In connection with that conversation were you

```
 1    asked to write a memorandum regarding whether the policy
 2    was applicable to you?
 3         A    I was asked to write a memo because I was seen
 4    being picked up in my wife's car with tinted windows.
 5         Q    When you say that it was your wife's car, was
 6    the vehicle registered to you?
 7         A    Registered to myself and my wife.
 8         Q    Okay.  So you were one of the registered owners
 9    of the vehicle?
10         A    Yes.
11         Q    And was the vehicle one of the ones that you
12    submitted to home address confidentiality forms to the
13    DMV on?
14         A    Yes.
15         Q    And did you believe back July 6th -- strike
16    that.
17              Did you believe on July 5th that that vehicle
18    was not subject to the coverage of Chief Coe's memo?
19         A    No, I didn't.
20         Q    Was there a reason that you had not had the
21    tinting removed from the windows between June 20th and
22    June 30th as the memo --
23         A    Yes, because it's primarily my wife's car.  She
24    drives it, or she drove it most of the time, and her
25    family has a long history of skin cancer, and she didn't
```

```
 1   want to remove it.  So I wasn't going to make her.
 2        Q    And at any point in time since July 5th, 2011
 3   has the tint been removed?
 4        A    Was the tint removed after I was told about it?
 5        Q    Yes.
 6        A    Yes, it was.
 7        Q    Okay.  How soon after?
 8        A    The same day.  I went home that night and
 9   removed it myself.
10        Q    Was any other kind of tint or sun protection
11   applied to the windows after that?
12        A    No.
13        Q    And had you had any conversations with --
14   strike that.
15             Had you ever been required to remove the
16   tinting from other vehicles that you owned and operated?
17        A    Yes.
18        Q    And when had you removed tint from those
19   vehicles?
20        A    I believe it was a year before this e-mail, or
21   it could have been -- I don't know -- six months to a
22   year an e-mail came out saying that all the cars that
23   have tint and no front plates you need to take off your
24   tint and put on front plates, and I did that immediately
25   on the car that I drive to work.
```

1    this result in discipline, and he wouldn't answer me.

2       Q    Okay.  The statement that he attributes to you,

3    quote, "What am I supposed to write, I like tint," is

4    that a statement that you made to him?

5       A    Yes.

6       Q    Back on July 5th, 2011 when this tint issue

7    apparently arose, did you have an understanding that

8    because of your wife's family history of skin cancer,

9    that the Vehicle Code provisions concerning window

10   tinting did not apply to her?

11      A    No.

12      Q    And I don't want you to put your address on the

13   record, but in what city did you live at the time that

14   this came up back in July of 2011?

15      A    In Beaumont.

16      Q    At some point after that conversation that you

17   had with Commander Fagan did you receive a Notice of

18   Intent to Discipline?

19      A    Yes.

20      Q    And if you would take a look at Pages 7 through

21   10, and this is a copy of the Notice of Intent to

22   Discipline that you received? ; is that correct?

23      A    Let me look at it.  So it's seven through ten?

24      Q    Seven through ten, yes.

25      A    Yes, this is what I received.

13

1    Q    And the signature that appears on Page 9 and

2    the date 7-25-11, is that your signature and your

3    handwriting on the date?

4        A    Yes.

5        Q    And the recommended action in the Notice of

6    Intent was a 40-hour suspension, a reduction in rank and

7    a removal from your current assignment; is that correct?

8        A    Yes.

9        Q    And then subsequent to that did you have a

10   Skelly meeting with the chief?

11       A    Yes.

12       Q    And if you would take a look at Page 25 and 26

13   in the packet there, did you receive a copy of this

14   Notice of Discipline after the Skelly?

15       A    Yes.

16       Q    And on the bottom of the second page of that at

17   Page 26, that's your signature and the date of August 2,

18   2011?

19       A    Yes, it is.

20       Q    Okay.    In the Notice of Discipline on the first

21   page it states that, as to Count One, Chief Coe writes,

22   quote, "I find you failed to adhere to a department

23   directive to ensure that your personal vehicles complied

24   with the California Vehicle Code."

25            Then he states as to Count Two, "I find that

14

1   you failed to adhere to a department directive to ensure

2   that your personal vehicles complied with the California

3   Vehicle Code.  I have elected to dismiss the allegations

4   of discourteous or disrespectful treatment and

5   insubordination or defiance toward a supervisor."

6          And you recall being advised that those were

7   the findings by the chief?

8      A    Yes.

9      Q    He then indicated that he proposed to amend the

10  discipline as follows:  "a suspension of 40 hours, which

11  will be held in abeyance for 12 months and dismissed if

12  there are no sustained complaints of misconduct of the

13  same or similar nature during that period, removing from

14  your assignment as a police corporal for a period of 12

15  months, and during that period you will continue to

16  receive your current pay."

17         So you understood that one of the components of

18  the discipline that the chief actually planned to

19  implement was, in effect, a stayed suspension of 40

20  hours and that you would continue to receive corporal's

21  pay, only you would be removed from that rank?

22     A    Yes.

23     Q    It goes on to state, "If during the first six

24  months you have performed at a level that is acceptable

25  by me, I will reappoint you to the position of police

15

1    corporal at that time and this entire investigation will

2    be removed from your file."

3            On the second page, which would be Page 26 in

4    the packet, it states, "You will also be removed from

5    your current assignment as a police detective.  You will

6    be eligible to reapply for a detective position after

7    the six- or 12-month evaluation based on your

8    performance at that time."

9            So your understanding was that you would be

10   removed from your detective assignment for a period of

11   potentially as little as six months; is that correct?

12       A    No.  I understood it as I'd be eligible to

13   reapply.  It wasn't I was going to get it back

14   automatically.

15       Q    I see.  Okay.  Did you have an understanding if

16   the discipline went forward as it was indicated in this

17   notice, whether you would lose any money as a result?

18       A    I don't know if it was talked about right away,

19   but either then or shortly thereafter, it talked about

20   that I wouldn't be getting my merit increase on schedule

21   because of this discipline.

22       Q    Do you know what the merit increase amounted

23   to?

24       A    About two dollars.

25       Q    Per hour?

```
 1      A    Yes.

 2      Q    From what to what, approximately?

 3      A    The pay rate?

 4      Q    Yes.

 5      A    $43 to $45 an hour.

 6      Q    And after receipt of the Notice of Discipline,

 7  did you proceed to appeal that discipline?

 8      A    Yes.

 9      Q    Then if you would turn to Page 27 and 28, were

10  you present during a mediation process in Riverside on

11  October 19th, 2011?

12      A    Yes.

13      Q    And you were represented by counsel at that

14  proceeding?

15      A    Yes.

16      Q    And at that point in time did you enter into an

17  agreement resolving your discipline?

18      A    Yes.

19      Q    If we turn to page -- well, first let's look at

20  Page 27, which is the first page of the agreement.

21  There is a signature line and then a printed name.  Over

22  the name "Jeremy Harris," that's your signature and the

23  date of October 19th?

24      A    Yes.

25      Q    And if we look at the terms of agreement, which
```

/7

1   are on Page 28, it states that the terms were, you would

2   serve a suspension of 40 hours without pay; is that

3   correct?

4       A    Yes.

5       Q    And that your removal from your assignment as a

6   corporal without a reduction in pay but you would be

7   reinstated contingent upon no sustained discipline, and

8   if there was an investigation pending at the expiration

9   of that six months, the reinstatement to your assignment

10   as a corporal would be deferred until that was disposed?

11          Is that your understanding?

12       A    Yes.

13       Q    So in effect you would be returned to your

14   assignment as a corporal and your detective assignment

15   on or about February 2, 2012 so long as there had been

16   no sustained discipline against you and there were no

17   pending disciplinary actions; is that correct?

18       A    Yes.

19       Q    And then Item No. 4 in the terms of agreement

20   states, "Final disposition and resolution, plaintiff

21   agrees no further appeal," and so you understood that

22   this was a final resolution of your appeal of the

23   disciplinary process?

24       A    Yes.

25       Q    And so by doing this, one of the things that

18

1        A     No.  It was -- February 2nd is when I was
2     restored back to corporal.
3        Q     All right.  Then after February 2nd, 2012 did
4     you receive any further promotions?
5        A     Recently I was appointed as acting sergeant.
6        Q     When were you appointed as an acting sergeant
7     some?
8        A     Oh, chief, do you remember?
9        Q     More than six months ago?
10       A     No.
11       Q     More or less than six months ago?
12       A     Less than six months.
13       Q     And do you have an understanding as to how long
14    that acting sergeant position is supposed to be in
15    effect?
16       A     Well, the chief can appoint for six months, and
17    then the city manager can extend that for another six
18    months, but it wasn't said, you know, exactly when.
19       Q     Was it your understanding that you were taking
20    the place of someone who was on leave or otherwise
21    unavailable?
22       A     Yes.
23       Q     And who was it that's on leave or unavailable?
24       A     Sergeant Jennifer Velazquez.
25       Q     And as an acting sergeant, what function are

```
 1   STATE OF CALIFORNIA            )
 2   COUNTY OF RIVERSIDE            )   ss.
 3
 4        I, Diane Carver Mann, C.S.R. No. 6008, in
 5   and for the State of California, do hereby certify:
 6        That prior to being examined, the witness named
 7   in the foregoing deposition was by me duly sworn to
 8   testify to the truth, the whole truth, and nothing but the
 9   truth;
10        That said deposition was taken down by me in
11   shorthand at the time and place therein named and
12   thereafter reduced to typewriting under my direction, and
13   the same is a true, correct, and complete transcript of
14   said proceedings;
15        That if the foregoing pertains to the original
16   transcript of a deposition in a Federal Case, before
17   completion of the proceedings, review of the transcript
18   XX was ( ) was not required.
19        I further certify that I am not interested in the
20   event of the action.
21        Witness my hand this 30th day of May,
22   2013.
23             Diane Carver Mann
24             Certified Shorthand Reporter
25             . for the State of California
```